Okay, the next case is number 161444. Evans against the Office of Compliance. Mr. Wagner. Good morning. May it please the court. Mr. Evans would submit that there are three reasons why this court should reverse. Three primary reasons. The first reason is that the record below is not based on substantial evidence. Rather, the record below indicates that all of the witnesses who testified before the hearing officer relied on hearsay and double hearsay. They had no personal knowledge of the facts about which they testified. The second reason... Do the rules of evidence apply in the proceedings before the lower body? Yes, Your Honor, we would submit that it does. And certainly if the record is supposed to be based on substantial evidence, this court has stated in several cases, Doe v. United States, 132 Fed Third, 1430, N. Ray Gartside, what have you, that a record is based on hearsay. And we would submit that in this case that something reliable had to be put forward for the court to rule on. This is especially true in a scenario in which none of the witnesses who provided statements filed complaints against Sergeant Evans. None. And in the case of Francine Baxter, who was the alleged target of the sexy librarian comment, she refused to cooperate with the union and did not file a complaint and only came forward with her remarks in a compelled interview. Now one of the things that stands out in this particular case is that prior to the hearing officer hearing this case, the disciplinary review board heard the same case and reached almost diametrically opposed findings. Can I ask you something? Even though the folks to whom these comments were made did not actually file complaints themselves, are you trying to suggest to me that these are appropriate workplace comments? And isn't it possible that a supervisor could conclude that these sort of comments are inappropriate in the workplace even if they're not offending the individual to whom they're made? Well, Your Honor, we would submit that propriety is not the standard for anti-harassment and discrimination claims. As the court is aware, the EEOC and the various courts of the E.C. Circuit and even this court have held that offhand comments, crude remarks, what have you, isolated, do not rise to the level of being a violation of anti-harassment and discrimination claims. But could it actually be a factor in the hostile environment? Could it not? Assuming for a moment that the conduct was pervasive and was continuous, what have you, it could be. But what we have here is not continuous comments. We have one-time comments, isolated comments that did not rise to the level that anybody complained about. The Capital Police, the disciplinary review officer, argued to the disciplinary review board that one-time comments could violate the Capital Police anti-harassment and discrimination policy. The D.R.B. rejected that as a basis for filing a case, a charge against an officer. That finding by these five lay officers of the officials of the disciplinary review board, that finding is consistent with the rulings of this court and the D.C. Circuit. And I would submit the rest of the federal judiciary that no one has held that a one-time comment could violate anti-harassment and discrimination policy. And that is what we have here. Moreover, none of the underlying claims that were filed in support of the report of investigation, none of the claimants filed claims. And if you examine the four primary charges against Sergeant Evans, the first one was, he said to Officer Baxter, I didn't know you wore eyeglasses. She says, I wear them for reading. He says, oh wow, they make you look like a sexy librarian. She was not offended. She did not file a complaint. And the reason that that charge came to the forefront was that Sergeant shutters were not looking for the claims. The second charge against Sergeant Evans was that he made a comment about chocolate milk. No one filed a claim on that. Rather, as he was explaining to Sergeant shutters about how everything occurred, he says, and I said to Officer Kovacs that they must have liked chocolate milk when they said that they dated black women and had babies by them. The third comment allegedly made regarding Sergeant Mendoza passing by, Captain Bollinger said that nobody could agree as to what Sergeant Evans said. So what you have is an inherently unreliable hearsay statement that is being used as a basis for the charges. And finally, with regard to Officer Merritt's alleged dating practices, or dislike of black men, Sergeant Evans was concerned that this woman carries a gun and if she dislikes black men, that could pose a problem if she used that gun. I'm not sure if, it's not in the record below, and I'm not sure that any member of this court is familiar with the controversy that is now going through the communities regarding the shooting of unarmed black men by police officers. This is what motivated Sergeant Evans. He says, look here, this woman is openly and notoriously against black men, and something has to be done about that. There's nothing in the record below that refutes that claim. Was she a black woman? She was a black woman. But she had, and this is really noteworthy, is because she expressed, hey, I don't like black men, there's a problem with black men. In fact, one of the allegations related to a joke that she told at roll call. In fact, that was one of the charges that the disciplinary review board rejected. She asked the question at roll call, what is the difference between a park bench and a black man? A black man cannot support a family. That was the joke that triggered a discussion by Sergeant Evans with the other two officials, which was overheard by another lady who, at the union's insistence, came forward with a statement saying that, hey, Sergeant Evans said this about this lady. Now, one of the things that we asserted below was that, if the court would permit me to drink a little water, my tongue is sticking to this. One of the things that we have asserted is that this case has monumental disparate treatment. The first one is, we invite the court's attention to the Blancado incident, where Sergeant Blancado hugged, kissed, and rubbed the head of Officer Zaleski, told him that he had sex with his wife. And he did this over, according to Captain Bollinger, he did this over a period of years. Officer Hunter complained and said, look here, this is what this man is doing, and this is offensive. He was doing this in front of the entire H1 shift. Nothing happened to Sergeant Blancado. Nevertheless, what happened here? No one complained about Sergeant Evans. Yet, not only did they demote him, but unlike in Sergeant Blancado's case, they went looking for additional charges when the original 25 to 30 claims against Sergeant Evans proved unfounded, unsupported. Was there evidence of disparate treatment because of race? Well, Your Honor, Sergeant Blancado is white. Sergeant Evans was black. In Sergeant Evans' case, they had a record number of claims against Sergeant Evans. In fact, Deputy General Counsel DeBiase said that he had never seen a case like this before with this many charges. And Captain Bollinger said that when charges are proven to be unfounded based on complaints, they don't go looking for additional charges. That is what she said. And what happened in this case? Sergeant Shutters, when everything proved to be unfounded, he went looking for additional charges. I invite the Court's attention to Allegation No. 15 in the Report of Investigation. Allegation No. 15 was, after they had found nothing supportive of the charges against Sergeant Evans, what Sergeant Shutters did was go looking for claims. He had heard that 10 officers had transferred from the shift because of something that Sergeant Evans had done. It turned out that none of the – they interviewed 10 officers and none of the charges proved to be founded. And so they had to move on. And when all of the charges were over with and had been investigated and none proved to be founded, they went out looking for the charge that resulted in Officer Baxter being forced to give testimony. The DRB found Sergeant Evans not guilty of that charge. They found him not guilty of the charge involving the choke at the roll call because it was old. And when the chief got around to disputing – I mean, demoting him, he relied on a charge that had been handled administratively. And one more thing I'd like to say for the remainder of my time. The union was told not to go soliciting charges when they were soliciting charges involving white officials. The union was told, don't do it. They don't do this. And the directives are found on page 260 to 265 of the appendix. But when the union decided to do something with regard to Sergeant Evans, the Capitol Police turned a blind eye to it. They allowed it to go on. They allowed them to search for additional claims and additional charges. That's another example of disparate treatment. And it's in that search that they came up with the sexy librarian, they came up with the chocolate milk charge that no one complained about. That's how they came up with the so-called tapping Sergeant Mendoza that she didn't hear. And no one could agree about what he said, which made the hearsay even more unreliable. And finally, with regard to the report of investigation that was submitted that they relied on, we were able to show at the hearing that Sergeant Shutters lied in his report. He said that the cell phone text had been lost when he was before the DRB. He said it was lost, but it was found. And finally, he also said that Sergeant Evans used the word F and P on the cell phones. That was not found. That was not there. If the court would give me a few seconds. Okay. Thank you. Thank you, Mr. Wagner. Mr. Ullman. May it please the court. I think the facts in this case are fairly simple. A hearing officer heard the testimony in this case. He heard the testimony of Chief Dine and all of the officers that were involved in making the demotion and the suspension decisions. And listened to all that evidence, and listened to Mr. Evans' evidence, and believed the testimony offered by the Chief of Police and the officers that investigated the charges, and believed them when they said that race or retaliation had nothing to do with the decisions that were made. And when we look at the case at this stage, we're looking at, is there substantial evidence to support those findings? And the question that really Mr. Evans doesn't answer is, why isn't that substantial evidence? Well, you know what? People sometimes don't even know when they have a latent prejudice. I once had somebody. I'm going to tell you a funny story about my daughter. My daughter's the second highest in her grade in math. The first highest is a little girl. And when I told this story to a friend, he said, I didn't know she went to an all-girls school. And I said, well, goodness sakes, she doesn't. Suddenly, it hit me. He thought, because the top two students in the class in math were both girls, she must go to an all-girls school. He's not the least bit discriminatory. He's a really nice person. He's extremely open-minded. And he was horrified when he realized where his brain had gone and why. So my question to you is, there may be testimony that these people didn't base their decision on race, but how do you reconcile that with what seems to be very, very, very strong evidence that there was a white officer in the same unit, the same Capitol Police unit, who was making what appeared to be consistent and far worse comments in the workplace on a regular basis, and that he was not disciplined in any fashion? How do you reconcile that? And I think the evidence of that officer was developed very carefully in the record, and the hearing officer really addressed that very elaborately in her decision. What she said is that the OPR, at least the management of the Capitol Police, were not aware of how severe those incidents were. I mean, they did not become aware until the testimony was offered during this hearing. And what they heard from Zaleskis, who was the alleged victim, at the time they initially investigated that incident, is that this was not a big deal, that the two of them had been friends for 10 years, and that they kind of had this behavior back and forth. Yeah, but it's my understanding that these statements, the record demonstrates undisputedly, were made at the beginning of roll call when everyone was present, and lots of people would have been hearing them. And so whether the guy who the statements were made to was somehow okay with them, and I find it hard to believe he truly was, but even if he was okay with them, everyone else was hearing these statements being made, and it was creating a work environment where, I mean, you know, I don't like the comments Mr. Evans made, and I can understand why you decided to look into them and investigate them, but clearly this is a problematic workplace. I'll tell you another story about my kids, right? If we have a rule at home, you can't eat cookies, you can't take any cookies from the cookie jar before dinner, but if I never enforce that rule, and if everybody's allowed to eat cookies whenever they want, and then all of a sudden I come down and I bring the hammer down on one child when I catch him eating cookies after he just watched me let 15 people eat cookies without any consequences, it starts to become a little bit problematic. This is, I can understand why you want to clean up this unit, because based on the evidence in this record, there are some real problems in this workplace that need to be addressed, but is it possible that this particular penalty is too harsh under the circumstances of this case given the entire record that was created? Right, well, just remember the procedural posture. I don't represent the Capitol Police. I represent the Office of Compliance, which was the board that actually heard the first appeal that was made, and they judged the evidence based on the substantial evidence standard as well, and when they have a hearing officer who's heard all the evidence and decided, I believe what they told me, and she was there, the hearing officer heard the testimony of the people, their scope of review is very limited. I mean, they're not going to second-guess the hearing officer. And you're going to tell me my scope of review is likewise extremely limited, and that even if I think that under the circumstances the penalty is harsh, that that's not my standard of review, that I don't get to make that decision. And the other thing that you have to bear in mind, the evidence, when we're talking about disparate treatment, we're saying it can potentially create an inference of discrimination, but it isn't an offense in and of itself. I mean, you still have to show that the reason behind the adverse employment action is because of race. And Mr. Evans argues that while there was this inference and that the hearing officer should have made the inference that he wanted them to make, but she was unable to do that. And when you have just one officer, and you have all sorts of different circumstances, the testimony was that there were multiple other officers, both black and white, who were disciplined and were demoted for similar circumstances. So that it's not just the one officer you're looking at when you have a large police force and you find one officer. And the conclusion that you want the fact finder to make, that this is a racial-based decision, the fact finder really has to look at all the evidence and listen to what the testimony is and make a decision. And it's very hard, at least very hard for my board, who I'm representing, for them to second guess what that fact finder found. And so to be clear, I understand the legal standard. It's not just a disparate treatment standard, right? I would have to conclude that there was no substantial evidence for a finding that his demotion was not based on race. That's correct. And that's a really tough standard. Right. And he has the burden of persuasion and the burden of proof. And basically, the hearing officer said, I believe what the police said. And there were actually seven areas of misconduct which were reduced to five charges. And it wasn't an isolated incident. One of them was for a period of a year that he was commenting about the dating habits of one of the sergeants. And these comments went on and on. The other thing that distinguished it from the other case was that he had been disciplined before for sexual harassment. He had received discipline for, I think, using a folder and tapping a female employee on the rear end as she went by. And that had resulted in discipline. So this was, in the police chief's mind, this was a pattern that he wanted. He did not want his frontline managers to be engaging. This was not the atmosphere that he wanted in the police force. What were the range of penalties that were, in fact, available under the circumstances for the allegations that the OPR found and sustained? Well, it could be everything from a reprimand to discharge. So he could have been removed, and yet he was only demoted. That's correct. And that likely is because the deciding official took into account his long and good service to the organization. Is that right? Precisely. I mean, if you read Chief Dine's letter, he says he went through the Douglas factors and looked at all the factors you would normally consider with an employee and decided that the appropriate penalty was demotion. Because basically, and I think the law is quite clear when you're dealing with managers, that you can hold them to a higher standard. That's a behavior that you just cannot tolerate. Because they're the alter ego of the company or of the department. And so they reflect directly on what the department is all about. So at least in my mind, this is not a difficult case. I mean, simply because he's asking the court to make inferences that the finder of fact just was not going to make in light of the direct testimony that she had regarding what the factors were. Any more questions or comments? Thank you, Mr. Ullman. Well, we'll restore a couple of minutes for a rebuttal. Mr. Wagner, if you wish. Thank you, Your Honor. A couple of things. First of all, the disciplinary review board, which heard this case, was told by the disciplinary review officer that this case was one of first impression, that there was never any case like this before the U.S. Capitol Police. Deputy General Counsel DiBiase says, this case is unlike anyone else. I've never seen this many charges leveled against one officer. Yes, but that doesn't necessarily mean that it's wrong. Maybe the officer did a lot of things wrong. But when all the charges, roughly 30 charges, proved to be unfounded, Captain Bollinger says that you don't go looking for more charges. And that is what happened in this case. He started looking for more charges when they were unable to sustain any of the 30 charges that had been leveled against them. Again, I invite the court's attention to allegation number 15. Once the charges were found to be unfounded, they were looking for more. They interviewed 10 officers. Did this man say something that was inappropriate to you? All of them said no. That's how they came across Officer Baxter. They went and interviewed five new female officers who might or might not have filed complaints. Did he say anything to you? All of them said no, except Officer Baxter, who said, well, you know, he once told me my eyeglasses made me look like a sexy librarian, but I wasn't offended by that. She was not offended. And the DRB's decision stands out in stark contrast. But none of what you're suggesting is anything that forms a basis for us to reverse. We don't have the right to reverse just because they investigated him more closely. You would have to establish that they did all of this because of his race. Well, Your Honor, that is the only explanation. I'm not hearing you explain that. Well, if the Court will permit me, number one, when you look at the four charges, the four charges have really no basis. Chocolate milk was never alleged by anybody, but they used that. Sergeant Shutters decided to include that. The statement about Sergeant Mendoza walking by, Captain Bollinger said nobody could agree on what he said, but yet it became a charge. The chocolate milk comment, no one filed a complaint about that, but yet it became a charge. He told Sergeant Shutters about that while he was discussing the Mendoza affair. And once again, Officer Baxter says, hey, I wasn't offended by being called a sexy librarian. And when you look at what they did, they told the union don't go out and solicit new complaints when the complaints involved white officers and white officials. But when they were trying to find something on Sergeant Evans, they permitted the union to go out. He went to Captain Spokart and said, hey, look here, this is what they're doing to him. The union is going out there soliciting complaints. You told them not to do that. They said, okay, fine, we'll go out there. And most of the charges against him were brought by the union. The Capitol Police told not to do that. And finally. Please wrap it up. Yes, Your Honor. I'm sorry. With regard to Officer Zaleski and Captain, here was a classic case of this man hugging and kissing Officer Zaleski, telling him he was having sex with his wife. And this was being done in front of the entire ship. Did they bother to go out and interview any of the people in that ship to find out if that was true? Sergeant Evans testified, yeah, it was true. I saw it myself. Everybody saw it. If you look at Officer Zaleski's testimony, he said, yeah, it was done in front of the entire ship. If they had done, in Sergeant Blancata's case, what they did in this one, going out to look for additional charges, they would have interviewed the people in the house one ship. And they would have asked, did you see Sergeant Blancata kiss Officer Zaleski on the top of his head and talk about having sex with his wife and rubbing his back? Did you see that? They would have found out that there was support for that claim, what have you. And Captain Bollinger would not have been testifying that there wasn't preponderance of evidence to prove that that offense occurred. Thank you, Your Honor. Thank you. Thank you both. The case is taken under submission. That concludes the.